IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IAN M RICHETTI,<br>*ADMINISTRATOR OF THE ESTATE OF*<br>*AMANDA CAHILL, DECEASED,*<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>CITY OF PHILADELPHIA, *et al.*<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:  Civil No.  5:25-cv-05289-JMG<br>:<br>:<br>: |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                          **December 19, 2025**

**I.      OVERVIEW**

This case arises from the tragic death of Amanda Cahill. While detained at the Philadelphia Institutional Correctional Center ("PICC"), Cahill died from a suspected untreated Fentanyl overdose. Compl. ¶ 1 (ECF No. 1). Plaintiff Ian Richetti, as administrator of Cahill's estate ("Plaintiff"), sued the City of Philadelphia, John Does 1-10, and ABC Corporations 1-5, alleging Defendants' deliberate indifference caused Cahill's death. *Id.* Defendant City of Philadelphia ("Defendant City") moves to dismiss Plaintiff's Complaint, arguing Plaintiff "fail[ed] to allege facts to support a plausible inference" that Cahill's death resulted from a "specific policy or custom on the part of the City to understaff" Philadelphia Department of Prisons ("PDP") facilities. *See* Def. City of Phila.'s Mot. to Dismiss, at 1 (ECF No. 8).

II.     **BACKGROUND**[1]

For years, the Philadelphia Department of Prisons ("PDP") has failed to maintain proper staffing practices. Compl. ¶ 24. Between 2015 and 2019, prison staffing levels dropped by 28%. *Id.* ¶ 28. Staffing issues only worsened after that. Correctional staffing declined by 440 officers over the next two years, but Defendant City only hired 119 new officers. *See id.* ¶ 29. Officers were abandoning shifts. *See id.* ¶¶ 31-32. In August 2021, Pennsylvania Prison Society Executive Director Claire Shubik-Richards stated that the Pennsylvania Prison Society had been "warning the city for months that the prison is dangerous, unconstitutional in its conditions, and past the boiling point." *Id.* ¶ 36. Longtime officers reported in October 2021 that PDP's facilities were the "worst they have ever seen." *Id.* ¶ 37. Prior Commissioner Blanche Carney blamed, and has continued to blame, the COVID-19 pandemic for its 28% staffing vacancy rate. *Id.* ¶ 43. Yet the vacancy rate for the Pennsylvania Department of Corrections is only 5.6%. *Id.*

PDP's staffing failures continued well after the pandemic. In May 2023, two inmates escaped from PICC through a cut fence. *Id.* ¶ 45. Staff allowed this to happen because they did not fix the fence despite knowing about it for days, prison staff did not physically count inmates, the lone staff member watching the entire cell block fell asleep, and cameras went unmonitored. *Id.* ¶ 46. And just weeks before Cahill's death, on August 16, 2024, this District found "Defendant City in contempt of court for failing to remedy unconstitutional jail conditions as per a 2022 settlement agreement." *Id.* ¶ 95. The Court ordered Defendant City to boost staffing immediately. *Id.*

PDP's understaffed facilities have also created an unsafe environment for inmates suffering from addiction issues. *See id.* ¶¶ 55-56. PDP's facilities have "unfettered access to drugs." *Id.* ¶ 50. Between 2018 and 2023, at least 25 people have died in accidents related to drug intoxication

---

[1] The Court accepts Plaintiff's factual allegations as true, as we must at this early stage.

in Philadelphia jails. *Id.* ¶ 51. In a June 2024 news article, PDP Chief of Medical Operations Dr. Bruce Herdman explained that "the officer staffing shortage makes it difficult to deliver timely, high-quality care for the approximately 4,700 people incarcerated in Philadelphia's jails daily—a majority of whom present with substance use disorder." *Id.* ¶ 54. Dr. Herdman acknowledged 19 overdose deaths in the jails since 2019. *Id.*

These failures came to a head with Cahill's death. As part of Defendant City's attempt to "clean up" the Kensington neighborhood—increasing police presence, dismantling homeless encampments, and coordinating mass arrests—Cahill was arrested during a "coordinated police sweep" on September 4, 2024. *See* Compl. ¶¶ 8-9. Cahill was taken to Pennsylvania Hospital for addiction-related treatment after booking and then placed with the general population at PICC later that same day. *Id.* ¶¶ 10-11. Despite "acutely, objectively, and obviously" exhibiting substance abuse-related symptoms, she did not receive regular medical evaluations or monitoring. *Id.* ¶¶ 12-13. In the early morning of September 7, 2024, Cahill and other inmates tried to alert the guards that Cahill needed medical help. *Id.* ¶¶ 15-16. They banged on the walls and begged the guards to help. *Id.* No one came. *See id.* ¶ 17. Cahill was found unresponsive at 7:45 AM. *Id.* ¶ 19. The autopsy results suggest that Cahill consumed the fatal dose of fentanyl within hours of her death, while in the custody of PDP. *See id.* ¶¶ 20-21.

Plaintiff, as administrator of Cahill's estate, brings claims against Defendants pursuant to 42 U.S.C. § 1983. *See generally id.* Defendant City moved to dismiss, arguing Plaintiff failed to allege municipal liability. *See* Def. City of Phila.'s Mot. to Dismiss, at 4 (ECF No. 8).

### III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

3

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotations and citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). A court is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Wheeler v. Wheeler*, 639 F. App'x 147, 149 (3d Cir. 2016) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013)).

## IV.     ANALYSIS

Plaintiff brings Section 1983 claims against Defendant City on the basis of municipal liability, as the Supreme Court recognized in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978). Notably, "a municipality is not liable for the unconstitutional acts of its employees just because of their employment, under a *respondeat superior* theory." *Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020) (citing *Monell*, 436 U.S. at 691).

Though not exactly clear to the Court, Plaintiff appears to present two different theories of *Monell* liability against Defendant City. First, Plaintiff argues that Defendant City's custom of understaffing of correctional facilities led to Cahill's death (Count III). Second, Plaintiff points to several failures and/or inadequacies that caused Cahill's death and that reflect Defendant City's deliberate or conscious choices (Count IV).

Defendant City's alleged longstanding failure to adequately staff its prison can constitute a "custom" under *Monell* liability, but Plaintiff's allegations as to the specific constitutional violation are vague and conclusory. Likewise, Plaintiff's "failure or inadequacy" claim does not

4

sufficiently plead deliberate indifference. Defendant City's Motion to Dismiss (ECF No. 8) is **GRANTED**. However, the Court will grant Plaintiff leave to file an amended complaint.

### a. Defendant City's Custom of Understaffing (Count III)

For Defendant City to be liable under the "custom" theory of *Monell* liability, Plaintiff must show that Defendant City had an unconstitutional custom that led to Cahill's death. *See Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)). "Custom stems from policymakers' 'acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.'" *Wright v. City of Phila.*, 685 F. App'x 142, 147 (3d Cir. 2017) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)); *see Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019). An unconstitutional custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Est. of Roman*, 914 F.3d at 798 (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

It is not enough, however, to allege the existence of a custom. Plaintiff must demonstrate that the custom proximately caused Cahill's death. *Id.* (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)). Plaintiff can do that by "demonstrating an 'affirmative link' between the . . . custom and the particular constitutional violation he alleges." *Id.* (citing *Bielevicz*, 915 F.2d at 850). "This is done for a custom if [Plaintiff] demonstrates that" Defendant City knew of "similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to" Cahill's death. *Id.* (citation modified) (citing *Bielevicz*, 915 F.2d at 851). "Plaintiff 'does not need to identify a responsible decisionmaker in his pleadings' nor 'prove that the custom had the City's formal approval.'" *Lau v. City of Phila.*, No. 24-CV-6352, 2025 WL 1902297, at *6 (E.D. Pa. July 9, 2025) (quoting *Est. of Roman*, 914 F.3d at 798).

Defendant City's sole argument as to why the Court should dismiss Count III of the Complaint is that it "cannot be held directly liable for a constitutional violation committed by its employees." *See* Def. City of Phila.'s Mot. to Dismiss, at 6 (ECF No. 8). But that misconstrues Plaintiff's allegations. *See* Pl.'s Opp'n to Mot. to Dismiss, at 7 (ECF No. 9). Nowhere did Plaintiff allege that Defendant City is vicariously liable for its officers' actions. Rather, Plaintiff alleges that Defendant City is liable due to its own widespread practice of understaffing PDP's facilities, *i.e.*, a "custom." *See* Compl. ¶¶ 87-91. More specifically, Plaintiff contends Defendant City's practice of understaffing PDP's facilities led to a lack of access to medical care and an insufficient number of correctional officers supervising PICC when Cahill's and other inmates' cries for help went unanswered for hours. *See id.* ¶¶ 87-89. Understaffing was the alleged "moving force" behind Cahill's Fourteenth Amendment rights being violated, and it proximately caused Plaintiff's damages. *See id.* ¶¶ 90-91. These are not vicarious liability allegations.

Defendant City then argues that Plaintiff's "understaffing" argument is insufficient to survive a motion to dismiss with respect to Count IV. *See* Def. City of Phila.'s Mot. to Dismiss, at 6-9 (ECF No. 8). Defendant City maintains that Plaintiff's allegations are conclusory, and Plaintiff fails to state facts showing that Defendant City chose to understaff PDP's facilities. *See id.* at 6-7. Defendant City also points to other "understaffing" cases in this District, which were all

dismissed.[2] *Id.* at 8. Even assuming Defendant City's arguments also apply to Count III,[3] the Court is not persuaded that understaffing cannot be the basis of a *Monell* claim.

Plaintiff specifically alleges that Defendant City has a longstanding problem with severe staffing shortages in the PDP, and that problem persisted at the time of Cahill's death. *See* Compl. ¶¶ 24-43, 54-56. Defendant City has known for years that PDP's facilities are dangerous and unconstitutional in their conditions. *See id.* Among other issues, Defendant City's staffing failures created an unsafe environment for inmates with addiction issues, leading to the death of at least 25 individuals between 2018 and 2025. *See id.* ¶ 51. PDP's own Chief of Medical Operations cautioned several months before Cahill's death that understaffing makes delivering timely, high-quality care to those incarcerated difficult. *See id.* ¶ 54. And on July 12, 2024, Judge McHugh of this District even held Defendant City in contempt for failing to remedy the very issue here—understaffing. *See Remick v. City of Phila.*, Order, No. 20-1959 (E.D. Pa. July 12, 2024) (ECF No. 220) ("[T]here is clear and convincing evidence that Defendants City of Philadelphia and Commissioner of Prisons are not in compliance with respect to at least two core issues addressed

---

[2] Defendant City also notes that Plaintiff did not identify a specific policy. *See* Def. City of Phila.'s Mot. to Dismiss, at 6 (ECF No. 8). The Court agrees. As the Court understands it, Plaintiff's two counts against Defendant City focus on: (1) the custom of understaffing, and (2) inadequate staffing and/or failure to protect Cahill. Plaintiff insinuates there may be a policy at play with respect to Defendant City "arresting medically vulnerable populations," but he does not develop this theory in the Complaint, let alone plead enough facts to state a *Monell* claim on this basis.

[3] Nowhere does Defendant City address that Plaintiff did not adequately plead a *Monell* claim in Count III; it only addresses *respondeat superior*. *See* Def. City of Phila.'s Mot. to Dismiss, at 6-9 (ECF No. 8). But that can, in part, be attributed to Plaintiff. The substance of Count III attempts to state a *Monell* claim, alleging understaffing was Defendant City's "custom." *See* Compl. ¶¶ 86-91. However, Plaintiff only referred to Count IV as a *Monell* claim. *See* Compl. at 16-17. Nonetheless, the parties each briefed their positions as to the "custom" issue, so the Court will address the merits of the parties' arguments.

by the Settlement Agreement—***staffing levels*** and out-of-cell time." (emphasis added)).[4] It can hardly be said that these are "mere conclusory allegations."

The "understaffing" cases are also distinguishable from this case. First, many of the cases are in different counties with different staffing issues. The remaining Philadelphia cases are older, when Defendant City arguably did not have notice of the direness of its staffing problems. Indeed, one of the understaffing cases cited by Defendant City, *Diaz v. City of Philadelphia (Diaz II)*, 670 F. Supp. 3d 174, 183-84 (E.D. Pa. 2023), explains just that. *Diaz II* notes that the plaintiffs in that case did "not supply sufficient facts as to the staffing levels before or at the time of Decedent's death," so the Court could not "determine how long the City has been on notice of the constitutional violations that may arise when prisons are understaffed." *Id.* at 183. The plaintiffs in *Diaz II* repeatedly cited to the *Remick* litigation to establish that Defendant City had notice, but the Court noted that the *Remick* litigation began only four months before the decedent's death, and understaffing was not raised as an issue yet. *Id.* at 183-84. Here, Plaintiff pled that Defendant City had ***years'*** worth of notice as to the problems that understaffing posed, Defendant City promised to remedy its understaffing in a 2022 settlement agreement, Defendant City failed to do so, and Judge McHugh held Defendant City in contempt for its understaffing failures. All of this occurred before Cahill's death.

Although Plaintiff has pled facts showing that Defendant City knew that understaffing has been a problem for years, Defendant City failed to remedy that problem, and that problem contributed to Cahill's death, Plaintiff's allegations fall short of stating a *Monell* claim. Plaintiff failed to address the specific Fourteenth Amendment violation at issue. Plaintiff's general

---

[4] Although Plaintiff pled that this District held Defendant City in contempt, *see* Compl. ¶ 95, the Court also takes judicial notice of the contempt Order. *See e.g.*, *Hartley v. Delaware Cnty.*, No. 2:25-CV-03078-JDW, 2025 WL 3000649, at *2 (E.D. Pa. Oct. 23, 2025) (citing *Hartig Drug Co., Inc. v. Senju Pharm. Co., Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016)).

allegation that "Cahill's Fourteenth Amendment rights" were violated is conclusory and does not inform the Court or Defendant City what right is being violated by understaffing.[5] *See Spell v. Allegheny Cnty. Admin.*, No. CIV.A. 14-1403, 2015 WL 1321695, at *5 (W.D. Pa. Mar. 24, 2015) (dismissing Section 1983 claim without prejudice where plaintiff did not identify "which Fourteenth Amendment protections he claims Defendants violated or to set forth sufficient facts to support such a claim"); *cf. Sharifi v. Twp. of E. Windsor*, No. CV2118097ZNQRLS, 2023 WL 2182003, at *6 (D.N.J. Feb. 23, 2023) (explaining plaintiff did not articulate which rights were infringed and failed to plead facts as to the alleged Fourteenth Amendment due process violation).

The Court **GRANTS** Defendant City's Motion to Dismiss as to Count III. However, the Court grants Plaintiff leave to amend his Complaint.

### b. Defendant City's Inadequate Staffing and/or Failure to Protect Cahill (Count IV)[6]

For Defendant City to be liable under the "failure or inadequacy" theory of *Monell* liability, Plaintiff must show that Cahill's death was "caused by a failure or inadequacy by [Defendant City]

---

[5] The Fourteenth Amendment protects a large number of rights. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976) (procedural due process); *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1955) (equal protection); *Jones v. Mississippi*, 593 U.S. 98, 105 (2021) (incorporating Eighth Amendment). The Court cannot assume what right Plaintiff is referring to, particularly because Plaintiff pled the incorrect constitutional provision in Paragraph 76 of the Complaint. *See Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193-94 (3d Cir. 2021) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)) (explaining Fourteenth Amendment's Due Process Clause applies to **pretrial detainees**); *Graham v. Connor,* 490 U.S. 386, 392 n.6 (1989) (recognizing Eighth Amendment attaches **after conviction and sentence**), *and Adams v. Delaware Cnty.*, No. CV 23-1178, 2024 WL 4349950, at *8 (E.D. Pa. Sept. 30, 2024) ("The Eighth Amendment prohibition against cruel and unusual punishment does ***not apply to pre-trial detainees***." (emphasis added) (citing *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005))). Plaintiff must be more specific. *See, e.g.*, *Thomas v. City of Harrisburg*, 88 F.4th 275 (3d Cir. 2023) (addressing right to medical care with respect to pretrial detainees).

[6] As the Court understands the Complaint, Plaintiff intends Count IV to be the "failure or inadequacy" theory of *Monell* liability. If Plaintiff intended otherwise, that should be clarified if Plaintiff files an amended complaint.

that reflects a deliberate or conscious choice." *Forrest*, 930 F.3d at 105 (citation modified). "Under *Monell*, deliberate indifference requires 'proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Hightower v. City of Phila.*, 130 F.4th 352, 357 (3d Cir. 2025) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). Deliberate indifference is found where "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 105-06 (citing *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "'[A] pattern of similar constitutional violations by untrained employees" is ordinarily necessary to demonstrate deliberate indifference, but a single incident may, in certain situations, be sufficient.[7] *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (internal quotation marks and citation omitted). Although the parties did not address this theory in their briefs, the Court dismisses Count IV, without prejudice. *See Bintliff-Ritchie v. Am. Reinsurance Co.*, 285 F. App'x 940, 943 (3d Cir. 2008) (quoting *Bryson v. Brand Insulations, Inc.,* 621 F.2d 556, 559 (3d Cir.1980)) (explaining courts may *sua sponte* dismiss claims under Rule 12(b)(6)).

Plaintiff dances around several "failure or inadequacy" theories in Count IV—inadequate staffing, failure to protect from "unfettered" drug access, and inadequate healthcare. *See* Compl. ¶¶ 92-99. Despite it being unclear what exactly is Plaintiff's theory, Plaintiff did not establish deliberate indifference as to any of them. Nowhere did Plaintiff address that "the wrong choice by

---

[7] Liability can attach in single-incident cases if the "need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id.* (citation modified) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989)); *see also id.* at 223-24 ("Liability in single-incident cases depends on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." (citation modified)). That does not appear to apply here because Plaintiff alleged at least 19 drug-related deaths occurred in PDP's facilities. *See* Compl. ¶ 54.

an employee will frequently cause deprivation of constitutional rights." The remaining prongs are also lacking. Plaintiff arguably addressed Defendant City's **policymakers** knew that employees would confront a particular situation as to inadequate staffing and inadequate healthcare, but not drug access. *See* Compl. ¶ 25 ("Prison Commissioner Michael Resnick . . . as well as Warden Earicka Patterson and prior Warden Norman Williams have long been aware of the dangers created by their failure to maintain proper staffing."); *id.* ¶ 54 (chief of medical operations stating it is difficult to deliver timely, high-quality care due to staffing shortage).[8] And while Plaintiff addressed a history of "unimpeded drug use and distribution" and "inability to monitor or care for people with serious drug dependency issues," Plaintiff did not address how understaffing involved a difficult choice or a history of the employees mishandling staffing.

Count IV is **DISMISSED**, without prejudice. However, Plaintiff will be granted leave to amend.

V.   **CONCLUSION**

For the foregoing reasons, Defendant City's Motion to Dismiss (ECF No. 8) is **GRANTED**. Counts III and IV are **DISMISSED**, without prejudice. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[8] Even here, it is unclear whether the chief of medical operations would be a "policymaker."

11