IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISCTRICT OF PENNSYLVANIA

| | |
|---|---|
| IAN M. RICHETTI, ADMINISTRATOR OF THE ESTATE OF AMANDA CAHILL, DECEASED<br>609 West Hamilton Street, Suite 301<br>Allentown, PA 18101<br>*Plaintiff*<br><br>v.<br><br>CITY OF PHILADELPHIA<br>1515 Arch Street, 15th Floor<br>Philadelphia, PA 19102<br><br>and<br><br>C.O. NISHYA YABROUGH<br>1515 Arch Street, 15th Floor<br>Philadelphia, PA 19102<br><br>and<br><br>JOHN DOES 2-10<br>8301 State Road<br>Philadelphia, PA 19136<br><br>*Defendants* | Civil Action No. 25-cv-5289 |

### FIRST AMENDED COMPLAINT

NOW COMES Ian Richetti, as Administrator for the Estate of Amanda Cahill, complaining of Defendants the City of Philadelphia, C.O. Nishya Yabrough and John Does #2-10 and for cause would show the Honorable Court as follows:

### NATURE OF THE CASE

1. On September 7, 2024, Amanda Cahill ("Ms. Cahill") died from the effects of suspected untreated Fentanyl overdose while incarcerated at the Philadelphia Institutional

1

Correctional Center. Overdose is treatable medical emergency. Defendants were aware of her condition and knew that she required monitoring and treatment as she recovered, yet failed to provide them. Defendants' deliberate indifference to Ms. Cahill's serious medical condition is the cause of Ms. Cahill's unnecessary and preventable death.

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Ian Richetti, is the duly appointed administrator of the Estate of Amanda Cahill and is an adult individual and resident of the Commonwealth of Pennsylvania.

2. This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the Constitution of the Commonwealth of Pennsylvania, and Pennsylvania Law.

3. This cause of action arose in Philadelphia County, Pennsylvania.

4. Defendant, City of Philadelphia, a City of the First Class organized and existing under the laws of the Commonwealth of Pennsylvania was responsible for the creation and operation of the Philadelphia Department of Prisons (hereinafter "PDP") including, but not limited to, the Philadelphia Industrial Correctional Center (hereinafter "PICC"). PICC is located at 8301 State Road, Philadelphia, Pennsylvania.

5. Defendant C.O. Nishya Yabrough is an adult individual who at all times relevant to this complaint was a corrections officer employed by Defendant City of Philadelphia.

6. Defendants John Does 2-10, fictitious names whose present identities are unknown, are unidentified persons who, at all times material hereto, were employees, agents and/or servants of the City of Philadelphia and were acting under color of state law in the course and scope of their duties at the PICC.

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourteenth Amendment

2

rights of Amanda Cahill. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §§ 1367 to adjudicate pendent state law claims.

8. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(b)(2) where the events or omissions giving rise to the Plaintiffs' federal claims occurred within the geographical limits of this District.

9. This action is also brought under the laws of the Commonwealth of Pennsylvania as Wrongful Death and Survival action pursuant to claims arising from Defendants' deliberate and malicious indifference in failing to adequately staff PICC for proper supervision of incarcerated people and failing train its various personnel in the recognition and treatment of medical issues in arrestees and incarcerated people and further depriving decedent Amanda Cahill of her rights to both due process, equal protection, and emergency medical care while incarcerated.

## FACTUAL BACKGROUND

8. On September 4, 2024, Amanda Cahill was arrested on possession of drug charges during a coordinated police sweep in Kensington, Philadelphia.

9. The sweep was part of the City's ongoing initiative to "clean up" Kensington, which has included increased police presence, the dismantling of unhoused encampments, and coordinated mass arrests in the Kensington neighborhood, beginning in May of 2024.[1]

10. On September 4, 2024, after being arrested and booked at the Philadelphia Police Department headquarters located at 400 N. Broad Street, Philadelphia, PA 19123, Ms. Cahill was taken by EMS transport to Pennsylvania Hospital, located at 800 Spruce Street, Philadelphia, PA 19107 to be treated for addiction-related issues.

---

[1] "9 months after Kensington cleanup, Philly officials offer progress report" by Tom MacDonald. THE PHILADELPHIA TRIBUNE. Feb. 25, 2025. https://www.phillytrib.com/9-months-after-kensington-cleanup-philly-officials-offer-progress-report/article_df1a0b95-1d39-5600-94f7-09d914bb0aeb.html. Last accessed Dec. 23, 2025.

3

11. Upon information and belief, Ms. Cahill was subsequently transferred to PICC that same day or the following day. Medical treatment housing was available, but Ms. Cahill was placed in general population.

12. Upon information and belief, while incarcerated at PICC, Ms. Cahill was acutely, objectively and obviously suffering from addiction and substance abuse.

13. Upon information and belief, Ms. Cahill did not receive regular medical evaluations and/or monitoring during her stay at PICC, despite exhibiting outward and obvious symptoms of substance abuse issues.

14. Dangerous physical symptoms, including a potentially fatal overdose, are known risks of substance abuse issues.

15. During the early morning hours of September 7, 2024, Ms. Cahill repeatedly and consistently cried out for medical attention from the confines of her cell, begging for medical assistance, and banging on the walls in order to capture the attention of the guards on duty.

16. Upon information and belief, multiple inmates in the immediate area of Ms. Cahill's cell were aware of her medical condition and, believing her to be in immediate danger, yelled out and banged on the walls in order to assist in capturing the guards' attention.

17. Defendant City's posting orders required two corrections officers to be staffed on the unit where Ms. Cahill was held.

18. Despite this posting order, Defendant Yabrough was assigned as the only corrections officer for Ms. Cahill's unit.

19. Defendant Yabrough was working the 7pm to 7am overnight shift from September 6 to September 7, 2024.

20. Defendant Yabrough – per PDP policy – was required to make rounds and check on inmates every 20 minutes.

21. Defendant John Does 2-4 were corrections supervisors who were required to make rounds and check on inmates throughout the night as well.

22. Per Defendant City's own investigation into the incident, neither Defendant Yabrough nor Defendant Does 2-4 made even a single tours of the housing unit during the overnight hours of September 6-7, 2024.

23. Nonetheless, Defendant Yabrough recorded in the log that she conducted all of her 20 minute tours – a fraudulent entry that went unchecked due to the lack of other officers on the block.

24. Furthermore, neither Defendant Yabrough, nor Defendant Does 1-3, responded to Ms. Cahill's or her fellow inmates' repeated cries and yells for medical assistance during the overnight period of September 6-7, 2024.

25. Despite the repeated and desperate efforts of Ms. Cahill and the other inmates, Ms. Cahill was not evaluated or provided any medical attention whatsoever.

26. Defendant Yabrough had objective knowledge of Ms. Cahill's immediate need for emergency medical care through the shouts and yells from Ms. Cahill and from nearby inmates.

27. However, Defendant Yabrough chose to ignore the calls for medical aid and failed to even check on Ms. Cahill, instead choosing to allow her to die in her cell.

28. At approximately 7:45 a.m. on September 7, 2024, Ms. Cahill was found unresponsive in her cell at PICC. She was subsequently pronounced dead at the scene.

29. Upon information and belief, Ms. Cahill's cause of death was suspected fentanyl overdose, an otherwise treatable and preventable medical emergency.

30. Based on the autopsy, Ms. Cahill's vitreous fentanyl levels indicate that the fatal dose of fentanyl was consumed within hours of her death.

31. Therefore, upon information and belief, Ms. Cahill was sold and/or given fentanyl while in the custody of the City of Philadelphia.

32. The use and trafficking of illegal drugs within Philadelphia Prisons has been wide spread and well known to the City and has been exacerbated by the City's chronic understaffing of the jails.

## FAILURES OF THE PHILADELPHIA DEPARTMENT OF PRISONS

33. For years, the PDP has displayed a consistent and systemic failure to maintain proper staffing practices, resulting in a significant understaffing leading to an increase in inmate deaths directly related to the lack of supervision.

34. Prison Commissioner Michael Resnick (who assumed his post on April 8, 2024 after prior Prison Commissioner Blanche Carney's retirement, and had previously been the Acting Prison Commissioner in 2016) as well as Warden Earicka Patterson and prior Warden Norman Williams have long been aware of the dangers created by their failure to maintain proper staffing.

35. Not only did the City of Philadelphia tolerate the escalating danger from their lack of staffing, but prior Commissioner Blanche Carney also went so far as to blame the issue on the general staffing shortages caused by the COVID-19, despite evidence that this practice existed long before the pandemic.

### *PDP's Established Practice of Understaffing*

36. According to the Philadelphia Office of the Controller, from 2019 to April of 2021 the PDP saw staff vacancies triple and conditions within the facilities become increasingly unsafe.[2]

---

[2] Philly's shockingly inhumane prison conditions by Rebecca Rhynhart: THE PHILADELPHIA INQUIRER. Published Oct. 6, 2021

37. During her tenure, former City Controller Rebecca Rhynhart expressed concern with staffing, stating:

> In June, my office released an analysis of the Department of Prisons, showing the department was operating 382 officers below the approved level for officer and inmate safety. The city made considerable progress reducing the prison population between 2015 and 2019, but the population has only decreased by about 2% since 2019. Prison staffing levels, meanwhile, have dropped by 28% over the same time."

38. This assessment was based on data provided by PDP which showed that from 2019 – 2021, correctional staffing declined by 440 officers and only 119 new officers were hired within that same period. At the time of the statement, Rhynhart indicated that more than 300 COs were needed to meet adequate staffing.

39. The City of Philadelphia acknowledged the danger that the staffing shortages create, pointing to the five inmate on inmate homicides in PDP facilities from August 2020 – May 2021. A total that exceeded the prior eight years combined.

40. The *Philadelphia Inquirer*, frequently reported on the failures of the PDP, including an April 23, 2021 article that stated that there were shifts where as many as 14 of the 15 workers abandoned their shifts.[3]

41. On May 19, 2021 it was reported that 64% of staff called out on Mother's Day weekend.[4]

42. Prior Commissioner Carney acknowledged that PDP was short 333 staff positions.

---

https://www.inquirer.com/opinion/commentary/philadelphia-prisons-correctional-officer-shortage-20211006.html. Last accessed Dec. 23, 2025.

[3] "Another assault at Philly jail leaves a man on life support and staff and prisoners warning of a crisis" by Samantha Melamed. THE PHILADELPHIA INQUIRER. Published April 23, 2021. https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html. Last accessed Dec. 23, 2025

[4] "Can Philly jails be forced to pay bail fund $10,000 a day? That's the ask in a federal lawsuit." by Samantha Melamed. THE PHILADELPHIA INQUIRER. Published July 7, 2024. https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html. Last accessed Dec. 23, 2025

43. This number continued to grow, and in June 2021 it was then reported that PDP was short 382 officers needed to operate safely.

44. By August 26, 2021 the gap had grown to 483 officers.

45. In an August 26, 2021 report, the Pennsylvania Prison Society executive Director Claire Shubik-Richards stated "we have been warning the city for months that the prison is dangerous, unconstitutional in its conditions, and past the boiling point."[5]

46. Correctional officers, including lieutenants, captains, and veterans of more than 20 years, told the Inquirer in October 2021 that the conditions in PDP facilities are the "worst they have ever seen."[6]

47. It was then reported that the number of staff needed to operate safely had grown to 500.

48. Highlighting the danger in the Philadelphia Prisons is the fact that the PDP inmate population fell by 2% since 2019, yet over that same period seen staffing levels dropped by 28%.[7]

49. On November 4, 2021, an analysis of PDP staffing rosters found that 20-30% of shifts on a given day were filled by officers and supervisors working overtime, and more than 40% of shifts listed were not filled at all.[8]

50. David Robinson, the president of the correctional officers' union, Local 159 of AFSCME District Council 33, stated that "we're in a situation where we don't have staff. That

---

[5] "'We need help': Video, reports depict violence and 'riots' at Philadelphia jails" by Samantha Melamed. THE PHILADELPHIA INQUIRER. Published August 26, 2021. https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html Last accessed Dec. 23, 2025.
[6] "Philly's shockingly inhumane prison conditions | Opinion" by Rebecca Rhynhart. THE PHILADELPHIA INQUIRER. Published Oct. 6, 2021. https://www.inquirer.com/opinion/commentary/philadelphia-prisons-correctional-officer-shortage-20211006.html. Last accessed Dec. 23, 2025
[7] *Id*.
[8] "Stabbings at Philly jail went unnoticed amid staff shortages, video shows" by Samantha Melamed and Dylan Purcell. THE PHILADELPHIA INQUIRER. Published Nov. 4, 2021. https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html. Last accessed Dec. 23, 2025

makes the prisons dangerous…they had an obligation to keep these jails safe. And I'm going to be honest: I believe they failed."[9]

51. By the November report, the City Controller's office claimed a 28% vacancy rate within PDP.

52. Commissioner Carney suggested then and has since continued to suggest that the COVID-19 pandemic is to blame, however at the same time the Pennsylvania Department of Corrections reported only a 5.6% vacancy rate.

*PDP's History of Unaddressed Security Issues*

53. During the week of September 21, 2022 the PDP decided to move its increasing women's population from the Alternative and Special Detention Central Unit to the Philadelphia Industrial Correctional Center.[10] They did this despite knowing the history of unaddressed security and staffing issues at PICC.

54. Nasir Grant and Ameen Hurst escaped from PICC on Sunday, May 7, 2023, and at a November 1, 2023 Public Safety Hearing, Philadelphia District Attorney Larry Krasner detailed the security failings at the facility dating back over ten years.[11]

55. These failings include: motion sensors being turned off for over ten, the fence that the two men escaped from being cut and staff aware of it days before the escape, prison staff not finding out about the escape for 19 hours because staff were not doing physically doing the count and instead reporting prior numbers, a single staff member watching the entire cell block area

---

[9] *Id.*

[10] "Philly jails see increase in women who are incarcerated, move to consolidate population" By Tom MacDonald. PBS WHYY PUBLIC MEDIA FOR PENNSYLVANIA, DELAWARE, NEW JERSEY. Sept. 21, 2022. https://whyy.org/articles/philly-jails-increase-in-women-incarcerated-move-to-consolidate-population/. Last accessed Dec. 23, 2025.

[11] "Issues dating back more than a decade led to Philly prison escape, DA says" by Deanna Durante. NBC PHILADELPHIA. Published November 1, 2023. https://www.nbcphiladelphia.com/news/local/issues-dating-back-more-than-a-decade-led-to-philly-prison-escape-da-says/3683707/. Last accessed Dec. 23, 2025.

9

asleep in her chair, and problems with the video surveillance technology and cameras not being monitored.

56. DA Krasner explained that it took 90 seconds for Hurst and Grant to get out, and that "[b]efore this escape ever occurred, we all knew there were issues that were occurring".

57. Bringing women with substance abuse issues to an environment with these known security and staffing issues represents deliberate and malicious indifference to serious medical need.

58. Indeed the very failures to do a physical inspection count and to monitor the block, allowed Ms. Cahill's pleas for help to be left unaddressed.

*PDP's History of Unaddressed Drug Abuse in its Facilities*

59. PDP inmates have unfettered access to drugs, illuminated by the persistent pattern of drug overdoses and a deficiency in the City's response to the rampant drug problem.

60. In 2023, a Philadelphia Inquirer review of medical examiner's data and court records has found that "at least 25 people who have died in the Philadelphia jails since 2018 of accidents related to drug intoxication." Importantly, "Some of the deaths were from overdoses; other people were going through withdrawal when they died, according to court filings."[12]

61. Over one weekend in March of 2020, at PDP's Curran-Fromhold Correctional Facility, four men who arrived at the jail on drug charges overdosed and three of them died. All four cases involved fentanyl.[13]

---

[12] "Drug deaths and overdoses plague Philly jails, raising concerns about plans to step up Kensington arrests" by Samantha Melamed and Aubrey Whelan. THE PHILADELPHIA INQUIRER. Published July 7, 2024. https://www.inquirer.com/news/philadelphia/kensington-drug-arrests-jails-overdose-deaths-philadelphia-20240707.html?ref=kensingtonvoice.com. Last accessed Dec. 23, 2025.

[13] Philadelphia prisons investigating 4 overdoses, including 3 deaths, in custody" by Samantha Melamed. THE PHILADELPHIA INQUIRER. Published March 4, 2020. https://www.inquirer.com/news/philadelphia-prison-drug-overdose-fentanyl-heroin-deaths-20200304.html. Last accessed Dec. 23, 2025.

62.     Andrew Drury, 42, was found unresponsive in the intake room of Curran-Fromhold Correctional Facility three days after his arrest in Kensington on drug charges. Just like Ms. Cahill, he was evaluated and received off-site medical treatment before being transferred to the jail and overdosing there. At least 29 people with substance abuse issues have died in Philadelphia jail or police custody since 2018 for reasons that appear connected to drug intoxication or withdrawal, according to medical examiner records reviewed by The Philadelphia Inquirer.[14]

63.     While Dr. Bruce Herdman, chief of medical operations for the Philadelphia Department of Prisons, admitted to only 19 overdose deaths in the city's jails since 2019, that number is still jarring and unacceptable. Dr. Herdman stated "the officer staffing shortage makes it difficult to deliver timely, high-quality care for the approximately 4,700 people incarcerated in Philadelphia's jails daily – a majority of whom present with substance use disorder." And that of those 19 overdose deaths, 16 died within the first week of arrival.[15]

64.     Incarcerated people are regularly being hospitalized for overdoses in Philadelphia Department of Prison's extremely understaffed facilities, and prisoners with serious health concerns resulting from drug dependency and abuse cannot be safely treated there. The City of Philadelphia has fostered an unsafe environment in the PDP, then rounded up individuals with serious addiction issues and locked them away in a location where the City knows they were not and cannot access help or treatment.

65.     While PDP has policies in place to provide medications for opioid use disorder, "severe short-staffing has hamstrung those policies — and fueled a climate of disorder and

---

[14] "A man in addiction who was arrested in Kensington last week died in jail days later" by Ellie Rushing and Samantha Melamed. THE PHILADELPHIA INQUIRER. Published March 11, 2025. https://www.inquirer.com/crime/inmate-death-philadelphia-jail-kensington-addiction-20250311.html. Last accessed Dec. 23, 2025.
[15] "As city leaders eye jail to clean up Kensington, Philly jails say they're stretched too thin." by Sammy Caiola and Jillian Bauer-Reese. KENSINGTON VOICE. Published June 14, 2024. https://www.kensingtonvoice.com/jail-to-clean-kensington-drug-market-philly-jails-understaffed/. Last accessed Dec. 23, 2025.

violence in the jails, which in the last few years have seen riots, a string of escapes, and dozens of deaths."[16]

66. The acts and failures to act by City personnel and healthcare professionals to appropriately monitor and provide care to Amanda Cahill led to her untimely death.

## WRONGFUL DEATH ACTION

67. Plaintiff brings this action pursuant to the Wrongful Death Act of the Commonwealth of Pennsylvania, 42 Pa.C.S.A. § 8301, to recover damages for the wrongful death of Amanda Cahill.

68. No other action has been brought to recover for Amanda Cahill's death under the aforementioned statute.

69. Decedent's survivors are her mother Gina Clark and sons, J.C. and J.M., minors who are entitled to recover damages for her death, and on whose behalf this action is brought pursuant to the Pennsylvania Wrongful Death Act 42 Pa.C.S.A. § 8301 et seq.

70. Ms. Cahill's death was caused by intentional, malicious, and/or grossly negligent conduct of said Defendants, individually and/or jointly.

71. As a direct and proximate result of the Defendants' individual and joint actions, Amanda Cahill was unnecessarily caused extreme physical pain, mental anguish and suffering, and death, and was deprived of the enjoyment and pleasure of life.

---

[16] "Drug deaths and overdoses plague Philly jails, raising concerns about plans to step up Kensington arrests" by Samantha Melamed and Aubrey Whelan. THE PHILADELPHIA INQUIRER. Published July 7, 2024. https://www.inquirer.com/news/philadelphia/kensington-drug-arrests-jails-overdose-deaths-philadelphia-20240707.html?ref=kensingtonvoice.com. Last accessed Dec. 23, 2025.

72. As a further direct and proximate result of said Defendants' actions, decedent's survivors have suffered serious emotional pain and economic loss due to the wrongful death of Amanda Cahill.

73. Plaintiff claims all available damages under the Wrongful Death Act of the Commonwealth of Pennsylvania for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contributions that Amanda Cahill, would have rendered to the wrongful death beneficiaries but for her traumatic, untimely and unnatural death occurring as a result of the unlawful acts and omissions which are subject to the present litigation.

74. Plaintiff claims damages for all medical bills and/or expenses.

75. Plaintiff claims all damages for payment of funeral or burial expenses.

## SURVIVAL ACTION

76. Plaintiff hereby incorporates all preceding paragraphs as is fully stated herein.

77. Plaintiff brings this action pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, for all recoverable damages under the Statute, including but not limited to loss of earnings, loss of earning power, loss of earning capacity, pain and suffering and emotional distress.

78. As a direct and proximate result of said Defendants' actions as described herein, Amanda Cahill suffered grievous bodily injury, and mental and physical pain and suffering.

79. From the time she was brought to PPIC until the time of her death, and throughout her detention, Ms. Cahill was conscious and aware of the denial of medical care and other harmful acts to which she was subjected by the Defendants, individually and/or jointly, and felt extreme pain and suffering as a result thereof while begging for help to save her life.

## COUNT I: VIOLATION OF THE FOURTEENTH AMENDMENT THROUGH

## **DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED AND FAILURE TO RENDER MEDICAL CARE BY DEFENDANT YABROUGH AND DEFENDANT JOHN DOES 2-10**

80. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

81. Defendants had subjective knowledge that Amanda Cahill had a serious medical condition, was suffering from the effects of addiction and substance abuse, and was having a medical crisis.

82. Defendant Yabrough and Defendant Does 2-10 were notified of the immediate need for medical care by Ms. Cahill's cries for medical assistance, as well as those of other detainees nearby.

83. Defendants had knowledge that Ms. Cahill was at serious risk of severe physical injury and/or death if medical intervention was not provided.

84. Despite Defendants' knowledge of the immediate need for medical care, Defendant Yabrough and Defendant Does did not even check on Ms. Cahill, let alone call for medical assistance or provide appropriate evaluation, monitoring, or treatment.

85. Defendants' decision to ignore the cries for medical assistance from Ms. Cahill and others, as well as their failure to provide Ms. Cahill medical care constitutes deliberate indifference to her Fourteenth Amendment rights to medical care as a pretrial detainee. *See, e.g., Thomas v. City of Harrisburg*, 88 F.4th 275 (3d Cir. 2023); *see also, Estelle v. Gamble,* 429 U.S. 97, 103-104 (1976).

86. At all times mentioned herein, the failure to render medical care to Ms. Cahill by Defendants was a violation of her Fourteenth Amendment rights in that it amounted to a deprivation of health and life in violation of the substantive Due Process Clause.

87. As a result of Defendants' deliberately indifferent actions and/or omissions, Ms. Cahill sustained past and future economic loss, physical and mental pain, suffering, anguish, severe emotional distress and death.

88. Furthermore, Ms. Cahill's decedents suffered loss of guidance, comfort, and association.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of Ten Million Dollars ($10,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

### COUNT II: VIOLATION OF THE FOURTEENTH AMENDMENT - DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED AGAINST THE CITY OF PHILADELPHIA —MONELL LIABILITY

89. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

90. As discussed above, Defendant City maintained a custom and practice of understaffing the prisons which resulted in its inability to adequately staff units, respond to crises, and deliver the constitutional minimum level of medical care.

91. The City was aware of this custom and practice, yet failed to remedy the problem.

92. This custom and practice of understaffing led to guards working without partners, working forced overtime, and a lack of oversight.

93. This custom and practice of understaffing led to Ms. Cahill's unit being staffed below post orders on the night and morning of her death.

94. The understaffing led to the failure to conduct the required 20 minute tours of the cell block. The lack of supervision caused by the understaffing led to Defendant Yabrough fraudulently entering in the log that the tours were completed.

95. As a result of understaffing, there were insufficient corrections officers to properly supervise Ms. Cahill's block, permitting her yells for help and those of fellow inmates to go unanswered for hours.

96. The City's practice of understaffing was the moving force behind the violation of Ms. Cahill's Fourteenth Amendment right to constitutionally adequate medical care.

97. Specifically, the City had a duty to ensure that PDP would provide necessary care, including for emergencies, mental health, and withdrawal, and wouldn't ignore severe health issues. *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 103 S. Ct. 2979 (1983), *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

98. Ms. Cahill's medical needs were ignored for hours, and the City was deliberately indifferent to the situation it created. Its practice and custom of understaffing its jails put her and others in an life-threatening situation.

99. The City's failure to implement the court mandated changes that would ensure pre-trial detainees' safety and its subsequent inability uphold its own staffing protocols, led to its specific failure to provide medically necessary care to Ms. Cahill in violation of her Fourteenth Amendment rights.

100. As a direct and proximate result of the City's deliberate indifferent practices, as described herein, Ms. Cahill has sustained past and future economic loss, physical and mental pain, suffering, anguish, emotional distress and death.

101. Furthermore, Ms. Cahill's decedents suffered loss of guidance, comfort, and association.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant pursuant to 42 U.S.C. § 1983, in an amount in excess of Ten Million Dollars, including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

    Respectfully submitted,

    **McELDREW PURTELL**

    */s/ John J. Coyle*
    John J. Coyle, Esq.
    Mark V. Maguire, Esq.
    Beulah Agbabiaka, Esq.
    1845 Walnut Street, 18th Floor
    Philadelphia, PA 19103
    (215) 545-8800
    jcoyle@mceldrewpurtell.com
    mmaguire@mceldrewpurtell.com
    bagbabiaka@mceldrewpurtell.com

Date: December 30, 2025